
Filed
Supreme Court of Guam, Clerk of Court

# IN THE SUPREME COURT OF GUAM

## IN RE ARTHUR U. SAN AGUSTIN,
Petitioner,

**v.**

## SUPERIOR COURT OF GUAM,
Respondent,

## PEOPLE OF GUAM,
Real Party in Interest,

## MASATOMO NADEAU,
Real Party in Interest.

Supreme Court Case No. WRP23-002
Superior Court Case No. CF0446-23

## OPINION

## Cite as: 2024 Guam 2

Argued and submitted on November 20, 2023
Hagåtña, Guam

**E-Received**
7/18/2024 2:59:46 PM


Appearing for Petitioner:
Joaquin C. Arriola, Jr., *Esq*. (briefed)
William B. Brennan, *Esq.* (argued)
Arriola Law Firm
259 Martyr St., Ste. 201
Hagåtña, GU 96910

Appearing for Real Party in
Interest Nadeau:
G. Patrick Civille, *Esq.*
Civille & Tang, PLLC
330 Hernan Cortez Ave., Ste. 200
Hagåtña, GU 96910

Appearing for Respondent:
Suzane P. Santiago-Hinkle, *Esq*.
Superior Court of Guam
120 West O'Brien Dr.
Hagåtña, GU 96910

Appearing for Real Party in Interest
People of Guam:
Gloria Ann L. Rudolph, *Esq.* (briefed)
Lewis K. Harley, *Esq.* (briefed & argued)
Office of the Attorney General
Government Corruption Division
590 S. Marine Corps Dr., Ste. 214
Tamuning, GU 96913

BEFORE: ROBERT J. TORRES, Chief Justice; F. PHILIP CARBULLIDO, Associate Justice; KATHERINE A. MARAMAN, Associate Justice.

**TORRES, C.J.:**

[1]     Petitioner Arthur U. San Agustin filed a Verified Petition for a Writ of Prohibition asking this court to vacate the decisions of Judge Alberto E. Tolentino sitting as a recusal judge on the question of Presiding Judge Alberto C. Lamorena III's disqualification in San Agustin's criminal case. San Agustin also asks that we exercise our authority in this original proceeding to disqualify Presiding Judge Lamorena. Respondent Superior Court of Guam and Real Parties in Interest People of Guam and Masatomo Nadeau[1] were given the opportunity to answer the petition. In an Order issued December 5, 2023, this court granted the petition in part and ordered further proceedings. We issued another order on December 19, 2023.

[2]     We grant the petition for a writ of prohibition in part and vacate the orders of Judge Tolentino deciding the disqualification issue, and we deny in part the petition to disqualify Presiding Judge Lamorena. We also exercise our supervisory authority to clarify the proper procedures (1) when a party seeks to challenge a recusal judge for cause, (2) for service of a writ petition, and (3) for service of a statement of objection on a judge or justice. We also refer Attorney General Douglas B. Moylan's conduct to the Office of Regulation Counsel.[2]

## I.  FACTUAL AND PROCEDURAL BACKGROUND

[3]     The criminal case that is the basis for this original proceeding was brought by the People against San Agustin and a co-defendant, Masatomo Nadeau. V. Pet. at 5 (Oct. 11, 2023). San

---

[1] While the case caption in the Petition for Writ of Prohibition spells Nadeau's first name as "Masamoto," the filings in the criminal proceedings in the Superior Court as well as Nadeau's filings in this court indicate his name is spelled "Masatomo."

[2] This Opinion supersedes the Order issued by this court on December 5, 2023. On December 19, 2023, this court issued an Order addressing the issue of disqualification of Presiding Judge Lamorena. This Opinion also supersedes that Order and shall be considered effective *nunc pro tunc* to December 19, 2023.

Agustin was initially charged with multiple counts of Tampering with Public Records (as a 3rd Degree Felony), one count of Official Misconduct (as a Misdemeanor), and one count of Obstructing Governmental Functions (as a Misdemeanor) for actions that allegedly occurred while he was serving as Director of the Guam Department of Public Health and Social Services. That indictment has since been amended to bring additional counts against San Agustin.

[4]     The case was assigned to Judge Alberto E. Tolentino. Judge Tolentino filed a Form One – Disqualification, disqualifying himself under 7 GCA § 6105 from presiding over the case. Judge Tolentino asserted that he, his wife, and his chamber clerk have or had close relationships with San Agustin and Nadeau, concluding this could create a conflict.

[5]     The case was eventually reassigned to Presiding Judge Alberto C. Lamorena III. San Agustin filed a Statement of Objection to Presiding Judge Lamorena's competency to preside. San Agustin argued that Presiding Judge Lamorena's participation would create an appearance of bias based on a Facebook post made in 2022 by then-candidate for Attorney General Douglas Moylan. He claims that Moylan used Presiding Judge Lamorena's name, title, and identification as a "Professional Reference" in campaign materials posted to a personal and campaign Facebook page. V. Pet. at 6 (citing Ex. B (Statement Obj., Aug. 22, 2023)).

[6]     Presiding Judge Lamorena answered the Statement of Objection denying that San Agustin's allegations required his disqualification. The matter was ultimately referred to Judge Tolentino solely to assess whether Presiding Judge Lamorena should be disqualified. According to the Superior Court, assignment of recusal judges is based on a single randomized list of Superior Court judges cycled through every time a statement of objection is filed without regard to disqualification in the underlying matter. Oral Arg. at 10:49:16-10:51:46 (Nov. 20, 2023). Judge Tolentino issued a Decision and Order which concluded Presiding Judge Lamorena's

disqualification was unnecessary. San Agustin then moved for reconsideration on several bases, including that Judge Tolentino was already disqualified in CF0446-23 and should not decide San Agustin's statement of objection. Judge Tolentino issued a second Decision and Order denying the motion for reconsideration.

[7]     San Agustin filed a Verified Petition for a Writ of Prohibition in this court. We issued an Order inviting the Superior Court to address the petition and ordering real parties in interest to file answers to the petition, which they respectively did. But the Superior Court and the People did not file answers that denied or admitted the factual allegations in San Agustin's petition. We issued a briefing schedule, and the issues raised by the petition were briefed. Oral argument was held, and the Superior Court and the People were ordered to file answers either admitting or denying the factual allegations in the petition. Both parties complied, and the answers were received. The facts recounted above are generally undisputed by the parties, although they disagree about their legal significance. *See* Resp't's Answer at 2-3 (Nov. 22, 2023); People's Answer at 3-5 (Nov. 22, 2023).

[8]     On December 5, 2023, we issued an order granting in part the petition and vacating the decisions of Judge Tolentino. We gave Presiding Judge Lamorena leave to amend his answer to San Agustin's statement of objection and ordered further original proceedings. We also made factual findings, resolving the conflicts about the significance of Moylan's Facebook post. We found that the curriculum vitae ("CV") was published as part of campaign material posted on Moylan's social media page used to publicly announce policy goals and garner support for Moylan's candidacy and policies:

> Nadeau and San Agustin raise a salient point that Moylan was not applying for a position or seeking a private recommendation—he was running for public office. Generally, one does not publish a Curriculum Vitae for public consumption as part of a job application process. It would have been highly unusual for Moylan

to post a CV on his public Facebook page if he were applying for a position in private practice. The conclusion that the CV was campaign material is also strengthened by its contents: under the experience section, Moylan lists what seem to be policy positions, while other portions of his CV seem out of place in a professional document.[3] *Cf.* 3 GCA § 17101(a) (defining campaign advertisement as "any communication . . . which identifies a candidate directly or by implication, or which advocates or supports the nomination for election of the candidate . . . ."); 3 GCA § 17120(a) ("No person shall cause or submit any advertisement in support of a candidate to be published, . . . posted on-line, . . . or otherwise circulated and distributed, except under the following conditions . . . .").

Order at 14 (Dec. 5, 2023) (alterations in original).

[9]      After receiving Presiding Judge Lamorena's amended answer, we made these other factual findings:

> On August 28, 2022, then-candidate for Attorney General Douglas Moylan posted to his public Facebook page a "curriculum vitae" ("CV"). The Facebook page was used for campaign advertisement. The CV was campaign literature which identified Moylan as a candidate for Attorney General by implication. The CV used Presiding Judge Lamorena's name, title, and identification as a "Professional Reference."

> Presiding Judge Lamorena did not know of his reference in the CV, and he did not publicly endorse Moylan for the position of attorney general. Presiding Judge Lamorena did not permit Moylan to use him as a public professional reference for Moylan's qualifications to serve as attorney general.

> The CV remained accessible on Moylan's Facebook page—including after the indictment of San Agustin was announced via press release on that same page—until the post was deleted on December 5, 2023. Presiding Judge Lamorena amended his answer on December 11, 2023. He stated that,

>> I am prepared to take the necessary steps to cure any remaining "appearance of bias," and ensure the perception of impartiality remains. I am also prepared to demand that Attorney General Moylan immediately remove any publications which use my name and title as a reference in all media outlets, including but not limited to, social media platforms or websites. Within seven (7) calendar days of receiving the Supreme Court's Order, I will cause to deliver a letter addressed to Attorney General Moylan instructing him to delete any existing publications and to refrain from using my name and title as a reference in any public forums including but not limited to social media livestreams, speeches, lectures, interviews,

---

[3] This includes listing ethnic background, religion, and family history.

webinars, memos, correspondence, or other future communications without my consent or knowledge.

Presiding Judge Lamorena stated "unequivocally" that Attorney General Moylan is not in a special position to influence him and that Attorney General Moylan's use of his name and title in his August 2022 Facebook post was a unilateral action by him. Attorney General Moylan confirmed he "never sought out nor asked Presiding Judge Lamorena to publish" his CV "before or after it was published on Facebook."

Order at 2-3 (Dec. 19, 2023) (internal citations omitted).

[10]   We denied the rest of the petition in our December 19th order and retained jurisdiction to issue this written opinion.

## II.  JURISDICTION

[11]   We have original jurisdiction over petitions for writs of prohibition under 48 U.S.C.A. § 1424-1(a)(1), (3), and (4); 7 GCA §§ 3107(b) and 31301; and Rule 24 of the Guam Rules of Appellate Procedure. We also have supervisory jurisdiction over the Superior Court under 48 U.S.C.A. § 1424-1(a)(1) and 7 GCA § 3107(b).

## III.  STANDARD OF REVIEW

[12]   A party may seek review of a judge's decision denying disqualification through a writ proceeding. *See Van Dox v. Superior Court (Alcorn)*, 2008 Guam 7 ¶ 15 (quoting *People v. Johnny*, 2006 Guam 10 ¶ 21 (per curiam)). "A writ of prohibition may be granted if a tribunal acted in excess of its jurisdiction." *Id.* We interpret the recusal statutes *de novo*. *Id.* (citing *Long-Term Credit Bank of Japan v. Superior Court*, 2003 Guam 10 ¶ 28 (per curiam)).

[13]   Our supervisory power "was designed to control summarily the course of litigation in the inferior courts and prevent an injustice being done through a mistake of law or a willful disregard of it when there is no appeal from the erroneous order, or the relief obtained through the appeal would be inadequate." *Tumon Partners, LLC v. Shin*, 2008 Guam 15 ¶ 18 (quoting *State v. Helena*

*Waterworks Co.*, 115 P. 200, 201 (Mont. 1911)). "[I]t is completely within the sound discretion of this court to exercise its organically conferred power of supervisory jurisdiction . . . ." *Id.* ¶ 16.

## IV.  ANALYSIS

### A.  It Was Error for Judge Tolentino to Decide the Objection

[14]    San Agustin asserts that Judge Tolentino could not serve as the recusal judge to decide Presiding Judge Lamorena's disqualification because Judge Tolentino himself was disqualified from the case. *See* V. Pet. at 9.

[15]    The parties disagree about the proper construction of Guam's judicial recusal statute, 7 GCA § 6107.  The recusal statute provides that whenever a judge who ought to be disqualified "to sit or act as such in any action or proceeding" fails to recuse themselves, any party may file a written statement objecting to the judge hearing the matter.  7 GCA § 6107 (2005).  The statute further provides that "in every case the question of the . . . Judge's disqualification shall be heard and determined by some other Judge." *Id.*  Specifically, the parties dispute whether the "other judge" required by the statute means a judge not already disqualified from hearing the underlying matter or simply a judge different from the one who is the subject of the disqualification challenge. *See generally* Pet'r's Br. (Nov. 3, 2023); Resp't's Br. (Nov. 13, 2023); Nadeau's Br. (Nov. 13, 2023); People's Br. (Nov. 13, 2023).

[16]    "In cases involving statutory construction, the plain language of a statute must be the starting point." *In re Estate of Leon Guerrero*, 2023 Guam 10 ¶ 27 (quoting *People v. Rachulap*, 2022 Guam 9 ¶ 18).  This is our starting point because our "task is to determine whether or not the statutory language is 'plain and unambiguous.'" *In re Guardianship of Moylan*, 2021 Guam 15 ¶ 36 (quoting *Aguon v. Gutierrez*, 2002 Guam 14 ¶ 6).  "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that

language is used, and the broader context of the statute as a whole." *Id.* (quoting *Aguon*, 2002 Guam 14 ¶ 6). "[I]n expounding [on] a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Id.* (alterations in original) (quoting *Sumitomo Constr., Co. v. Gov't of Guam*, 2001 Guam 23 ¶ 17). "A statute is ambiguous if, after this analysis, 'its terms remain susceptible to two or more reasonable interpretations.'" *In re Estate of Leon Guerrero*, 2023 Guam 10 ¶ 45 (quoting *Halversen v. Allstate Prop. & Cas. Ins. Co.*, 2021 UT App 59, ¶ 9, 493 P.3d 693). When a statute is ambiguous, we may look to the legislative history and other sources. *In re Leon Guerrero*, 2005 Guam 1 ¶ 31 (citing *People v. Angoco*, 1998 Guam 10 ¶ 5). "Generally, when a legislature adopts a statute that is identical or similar to one in effect in another jurisdiction, it is presumed that the adopting jurisdiction applies the construction placed on the statute by the originating jurisdiction." *In re Estate of Leon Guerrero*, 2023 Guam 10 ¶ 35 (quoting *Sumitomo Constr. Co. v. Zhong Ye, Inc.*, 1997 Guam 8 ¶ 7); *see also Tumon Partners, LLC v. Shin*, 2008 Guam 15 ¶ 28.

[17]    After referring to the language of the statute itself, the specific context in which that language is used, and the broader context of the statute as a whole (including its object and policy),[4] we find the language of section 6107 is ambiguous because it is susceptible to more than one reasonable interpretation. Both interpretations advanced by the parties are reasonable; the "other judge" required by statute could reasonably mean either a judge not already disqualified from hearing the underlying matter or a different judge from the one being challenged. We therefore look to legislative history and other persuasive authority.

---

[4] The dual purpose of Guam's disqualification statute is "promoting 'judicial economy' and 'fundamental fairness.'" *See People v. Hull*, 820 P.2d 1036, 1040 (Cal. 1991) (in bank); *see also People v. Johnny*, 2006 Guam 10 ¶ 21.

[18]     As we have observed in past cases, "Section 6107 is derived from former Cal. Civ. Proc. Code § 170 (West 1981) and thus California cases interpreting section 170 are persuasive authority." *Johnny*, 2006 Guam 10 ¶ 13 n.4 (citing *Cruz v. Cruz*, 2005 Guam 3 ¶ 9).  Before amendment in 1984, California's section 170 "contained language identical to our section 6107." *Long-Term Credit Bank*, 2003 Guam 10 ¶ 38; *see also* 2 Witkin, Cal. Proc. 6th *Courts* § 134 (2024).  California courts interpreted section 170's statement that "'[n]o . . . judge shall sit or act as such in any action or proceeding' in which he is disqualified," as a "broad prohibition" that deprived the judge of the power to make even nondiscretionary orders.  *Noorthoek v. Superior Court*, 75 Cal. Rptr. 61, 64-65 (Ct. App. 1969); *see also* 2 Witkin, Cal. Proc. 6th *Courts* § 135 (2024).  Under the former version of section 170, the actions of a disqualified judge had to be vacated if challenged.  *See Urias v. Harris Farms, Inc.*, 285 Cal. Rptr. 659, 663 (Ct. App. 1991) ("In applying the former disqualification statutes, the courts have generally held that a judgment or order rendered by a disqualified judge is void whenever brought into question.").

[19]     Yet California courts have been imprecise with their language when discussing later orders and judgments issued by disqualified judges.  *Compare People v. Whitfield*, 228 Cal. Rptr. 82, 84 (Ct. App. 1986) (holding that after disqualification, "[t]he judge immediately loses jurisdiction and all his subsequent orders and judgments are void"), *with In re Christian J.*, 202 Cal. Rptr. 54, 56 (Ct. App. 1984) ("[T]he actions of a disqualified judge are not void in any fundamental sense but at most voidable if properly raised by an interested party.").  We find the following formulation of the rule in *Urias v. Harris Farms, Inc.* by the California Court of Appeals to be persuasive:

> [L]ittle is accomplished by calling the judgment of a disqualified judge "void," the problem is one of jurisdiction.  While the disqualified judge totally lacks power to hear and determine the cause, the court itself is not without jurisdiction.  But the court, with subject matter jurisdiction, may properly be held to lack jurisdiction to act while the judge is disqualified.  The problem is more accurately one of excess of jurisdiction.  "Consequently, the actions of a disqualified judge are not void in

> any fundamental sense but at most voidable if properly raised by an interested party." A party who seeks to declare a judgment void on the ground the judge was disqualified must allege and prove facts which clearly show that such disqualification existed.

285 Cal. Rptr. at 664 (first citing 2 Witkin, Cal. Proc. 3d *Courts* § 75 (1985); and then citing *Wickoff v. James*, 324 P.2d 661, 665 (Cal. Dist. Ct. App. 1958)).

[20]     Here, there is no reason to depart from California case law. *See Johnny*, 2006 Guam 10 ¶ 14. Under 7 GCA § 6107, a disqualified judge lacks the power to hear and determine the matter. Once disqualified, a judge can take no action—even when acting in a limited capacity as a recusal judge. When the actions of a disqualified judge are properly challenged, the actions should be vacated. We vacate the decisions of Judge Tolentino on the statement of objection as exceeding the court's jurisdiction.

## B. Presiding Judge Lamorena Is Not Disqualified by the Facebook Post

[21]     As we have vacated the orders of Judge Tolentino, we may decide the merits of the disqualification issue. *See Garcia v. Superior Court*, 203 Cal. Rptr. 290, 302-03 (Ct. App. 1984); *see also Dizon v. Superior Court (People)*, 1998 Guam 3 ¶ 10 ("This Court finds that the trial court's analysis of the recusal statute and the standard created by case law is flawed and, thus, we proceed with our own analysis of Judge Lamorena's recusal."); *Long-Term Credit Bank*, 2003 Guam 10 ¶ 15 (holding qualification of trial court judge to preside in matter is addressable under our writ jurisdiction); *cf. Ada v. Gutierrez*, 2000 Guam 22 ¶ 14 ("We see no legitimate reason to waste time and other resources when we can apply the rule of necessity immediately.").

### 1. Guam law on disqualification

[22]     "Title 7 GCA § 6105 sets forth the substantive grounds under which a judge . . . must be disqualified." *People v. Tennessen*, 2010 Guam 12 ¶ 25 (per curiam). Because section 6105 is taken from the federal disqualification statute, 28 U.S.C.A. § 455, we have held that the federal

courts' interpretation of the federal statute is instructive. *Id.* "A judge must disqualify himself or herself in any proceeding in which his or her impartiality might reasonably be questioned." *Id.* ¶ 33 (citing 7 GCA § 6105(a) (2005); *In re Focus Media, Inc. v. NBC*, 378 F.3d 916, 929 (9th Cir. 2004)). "The purpose of this requirement is to avoid even the appearance of bias." *Id.* (citing *Van Dox*, 2008 Guam 7 ¶ 32; *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988)).

[23]     "Guam courts apply an objective, reasonable person standard in determining whether there is an appearance of bias meriting disqualification." *Id.* ¶ 49 (citing *Johnny*, 2006 Guam 10 ¶ 20). Under this standard, a reasonable person is assumed to know "all the facts, and understands the 'contexts of the jurisdictions, parties, and controversies involved,' including such 'realities of the Guam judicial system' as the relatively small number of lawyers in the Guam bar and 'the nature of Guam families.'" *Van Dox*, 2008 Guam 7 ¶ 32 (quoting *Ada*, 2000 Guam 22 ¶¶ 12-13); *see also San Union, Inc. v. Arnold*, 2017 Guam 10 ¶ 24. "A court should not hypothesize about what the reasonable person would believe only upon hearing the moving party's allegations. Instead, it should decide what the reasonable person would believe about a judge's partiality given all the relevant facts in the controversy." *Ada*, 2000 Guam 22 ¶ 12. Under this objective test, the court "inquires whether a reasonable person would have a reasonable basis for questioning the judge's impartiality, not whether the judge is impartial." *Tennessen*, 2010 Guam 12 ¶ 33 (citing *Sule v. Guam Bd. of Dental Exam'rs*, 2008 Guam 20 ¶ 14). In other words, "the court asks whether a person with knowledge of all the facts would perceive a significant risk that the judge will resolve the case on a basis other than the merits." *Id.* (citing *Clemens v. U.S. District Court*, 428 F.3d 1175, 1178 (9th Cir. 2005) (per curiam)).

[24]     "[T]he recusal statutes should not be so broadly construed so as to become presumptive . . . ." *Dizon*, 1998 Guam 3 ¶ 9. "7 GCA § 6105[] is not intended to 'bestow veto power over judges

or to be used as a judge shopping device.'" *People v. Camaddu*, 2015 Guam 2 ¶ 80 (quoting *Nichols v. Alley*, 71 F.3d 347, 351 (10th Cir. 1995) (per curiam)); *cf. Ada*, 2000 Guam 22 ¶ 21 ("We do not want to open a Pandora's box in which parties begin drawing a judge's family tree each time it seems that a judge will rule against them."). "The grounds asserted in a recusal motion 'must be scrutinized with care, and judges should not recuse themselves *solely* because a party claims an appearance of partiality.'" *Tennessen*, 2010 Guam 12 ¶ 49 (emphasis added) (quoting *In re Aguinda*, 241 F.3d 194, 201 (2d Cir. 2001)). This court has stated that "neither '[r]umor, speculation, beliefs, conclusions, innuendo, suspicion, opinion, and similar non-factual matters[,] [nor] mere familiarity with the defendant' give rise to disqualification." *Id.* (alterations in original) (quoting *Nichols*, 71 F.3d at 351). A judge should not "distance themselves from cases at the slightest suggestion." *Ada*, 2000 Guam 22 ¶ 15. "A judge's duty to hear a case and keep the wheels of justice rotating is just as strong as his or her duty to remove himself or herself if a reasonable person would not believe in his or her impartiality." *Id.*

[25]   Our recusal statute promotes fairness by avoiding the appearance of bias, but a party's one-sided perception of an appearance of bias is not grounds for disqualification. *Sule*, 2008 Guam 20 ¶ 20. Under our precedents, unilateral actions of third parties, without more, seldom require disqualification. *See Camaddu*, 2015 Guam 2 ¶ 80 ("If the trial court is required to 'recuse itself every time it receives unsolicited material uncomplimentary to a defendant prior to trial or sentencing [it] would create an intolerable situation which could lead to a manipulation of the criminal justice system.'" (alteration in original) (quoting *State v. Santangelo*, 534 A.2d 1175, 1188 (Conn. 1987))); *Sule*, 2008 Guam 20 ¶ 20. Yet a violation of the Code of Judicial Conduct's prohibition against political activities can be grounds for disqualification. *See Ada*, 2000 Guam 22 ¶ 23 ("No party suggests that Judge Manibusan has committed any of the acts which the ABA

Code of Judicial Conduct lists as 'inappropriate political activity.'" (citing Model Code of Judicial Conduct Canon 5(A)(1) (1990))).

### 2. Judicial endorsements of political candidates are disqualifying

[26]    Nadeau correctly asserts that "[i]t is beyond peradventure that judges cannot publicly endorse political candidates and cannot use the prestige of their name and position to advance the political interests of others." Nadeau's Br. at 28. In both state and federal systems, impermissible political activities are assumed to be disqualifying. *See Siefert v. Alexander*, 608 F.3d 974, 983-84, 86-87 (7th Cir. 2010) (upholding Wisconsin ban on judicial endorsements, based on ABA Model Code of Judicial Conduct, in part because remedy of recusal would be "onerous" in cases "where a judge endorses a prosecutor or sheriff who frequently appears in front of the court"); *Wersal v. Sexton*, 674 F.3d 1010, 1024, 27-28 (8th Cir. 2012) ("Under [judge's] sought-after system of open endorsements, . . . recusal would be an unworkable remedy because candidates and judges would be free to endorse individuals who would become frequent litigants in future cases, such as county sheriffs and prosecutors."); *Winter v. Wolnitzek*, 834 F.3d 681, 691-92 (6th Cir. 2016); *Wolfson v. Concannon*, 811 F.3d 1176, 1184 (9th Cir. 2016) (en banc); *see also In re Charges of Jud. Misconduct*, 404 F.3d 688, 698-99 (2d Cir. 2005) (discussing potential disqualifying effect of judge's public condemnation of President). Thus, if a judicial officer endorsed the candidacy of an Attorney General, it would require disqualification in prosecutions brought by the Office of the Attorney General.

### 3. The Facebook post is not enough to disqualify Presiding Judge Lamorena

[27]    San Agustin argues that a reasonable person who viewed "publicly posted political campaign material generated and published on a medium solely to garner support for then-candidate-Moylan's candidacy, including Presiding Judge Lamorena's name and title, would

question Presiding Judge Lamorena's impartiality in a case like the one below where now-AG-Moylan's conduct, practices, and efficacy are all at issue." Pet'r's Reply Br. at 2 (Nov. 16, 2023). Although he does not refer explicitly to the Code of Judicial Conduct, San Agustin's argument about the appearance of impropriety can be rooted in what he believes a reasonable person would perceive to violate Canon 2(B):

> A judge shall not allow . . . political or other relationships to influence the judge's judicial conduct or judgment. A judge shall not lend the prestige of judicial office to advance the private interests of . . . others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge.

ABA Model Code of Judicial Conduct Canon 2(B) (2003); *see also Wolfson*, 811 F.3d at 1184 ("When a judicial candidate actively engages in political campaigns, a judge's impartiality can be put into question, and the public can lose faith in the judiciary's ability to abide by the law and not make decisions along political lines."); *Winter*, 834 F.3d at 691-92 ("A ban on such endorsements also guards against the risk that, once a judge is elected, . . . he will not be perceived as being able to[] referee disputes involving elected officials he did or did not endorse.").

[28]     Applying this court's objective standard, a reasonable person would know "all the facts," including that: Moylan was Presiding Judge Lamorena's law clerk; Moylan used Presiding Judge Lamorena's name and title in his campaign material unilaterally; and, when the petition was filed, Presiding Judge Lamorena had taken no corrective action regarding the materials, which were still accessible to the public. *See Van Dox*, 2008 Guam 7 ¶ 32 (quoting *Ada*, 2000 Guam 22 ¶¶ 12-13). A reasonable person would also understand the "contexts of the jurisdictions, parties, and controversies involved," *id.*, which includes Moylan's election as Attorney General by a narrow margin, that a major part of his campaign was addressing government corruption, and that this case

is a prosecution against government officials for allegedly corrupt actions. This context would also include "realities of the Guam judicial system." *Id.*

[29]    If we limited our analysis to when the statement of objection was first made, one may conclude that San Agustin merely "claim[ed] an appearance of partiality" based on the appearance of an endorsement, but a reasonable person knowing all the facts would know that Presiding Judge Lamorena did not endorse Moylan. *See Tennessen*, 2010 Guam 12 ¶ 49. A reasonable person knowing all the facts would conclude that Presiding Judge Lamorena did not lend the prestige of his judicial office to advance the private interests of Moylan—or that he permitted Moylan to convey the impression that Moylan was in a special position to influence him—because Moylan acted unilaterally. Nor would a reasonable person conclude that the Presiding Judge let his relationship with Moylan influence his judicial conduct or judgment.

[30]    But as we noted in our December 5th order, the passage of time after Presiding Judge Lamorena learned of the Facebook post gave us pause: "Nowhere in his Answer or in proceedings below did the Presiding Judge disavow the use of his name or official title in published campaign material by AG Moylan . . . ." Order at 16 (Dec. 5, 2023) (quoting Pet'r's Br. at 27). In his initial Answer, the Presiding Judge stated:

> 7.  I did not publicly endorse Doug Moylan (or any other candidate) in the 2022 election cycle. Nor did I use my title as Presiding Judge to publicly advocate for any specific candidate during the 2022 election cycle.
>
> 8.  I was completely unaware that Doug Moylan's resume listed me as a "professional reference". I have never had the opportunity to view or even learn of the resume in question because I have never knowingly or intentionally created a Facebook profile. The creation and posting of the resume in question was a unilateral act by Doug Moylan which I gave no input or direction in.
>
> 9.  Having now seen the resume in question, it obviously does not suggest my support in obtaining convictions in this case. The resume indicates (1) that Doug Moylan served as my law clerk 30 years ago, and (2) that as someone who employed him, I am knowledgeable of his abilities as a lawyer. *See*

> Statement of Obj., Ex. A (Aug. 22, 2023). The resume doesn't suggest my advocation or endorsement of any specific skill/ability Doug Moylan possesses, or of his 2022 campaign in general. *Id.*

Super. Ct. Case No. CF0446-23 (Answer to Statement of Obj. at 2 (Aug. 25, 2023)).

[31]     We found that although no actual partiality existed, "the judge's actual state of mind, purity of heart, incorruptibility, or lack of partiality are not the [sole] issue." Order at 17 (Dec. 5, 2023) (alteration in original) (quoting *Dizon*, 1998 Guam 3 ¶ 9). An appearance of partiality can be created even though no actual partiality exists. *Dizon*, 1998 Guam 3 ¶ 9. But a judge may cure the appearance of bias in some cases. *Cf. Jackson v. State*, 21 A.3d 27, 38 (Del. 2011) (finding insufficient appearance of impropriety where trial judge passively received unsolicited opinion of withdrawing defense counsel and took "affirmative steps" demonstrating a lack of bias). Thus, we granted Presiding Judge Lamorena leave to take appropriate action and amend his Answer to the Statement of Objection to account for any curative action he had taken. Without curative action, the persistence of the CV—which remained accessible on Moylan's Facebook page where the indictment of San Agustin and Nadeau was announced and which we found to be part of campaign material—may have provided a reasonable basis for a reasonable person to conclude that Presiding Judge Lamorena permitted Moylan to convey the impression that Moylan is in a special position to influence him. *See Tennessen*, 2010 Guam 12 ¶ 33.

[32]     We allowed Presiding Judge Lamorena to amend his answer out of an abundance of caution. Order at 17 (Dec. 5, 2023) (citing *Dizon*, 1998 Guam 3 ¶ 9). We do not believe that Presiding Judge Lamorena changed course and permitted Moylan to convey the impression that Moylan is in a special position to influence him; instead, we suspect he was acting judiciously.[5]

---

[5] The Code of Judicial Conduct applicable to Superior Court judges—the 1990 ABA Model Code of Judicial Conduct, as amended in 2003—takes a more conservative view on judicial statements than does the most recent model code. *Compare* ABA Model Code of Judicial Conduct Canon 3(9) (2003) ("This Section does not prohibit judges

We were also motivated by the realities of the Guam judicial system and the practical considerations of what effects disqualification might have on the Superior Court. *See In re Literary Works in Elec. Databases Copyright Litig.*, 509 F.3d 136, 140 (2d Cir. 2007) ("[W]e as judges must balance our duty to appear impartial against several practical considerations, including the availability of other judges, the cost in judicial resources of recusal and reassignment of the case to different judges, and the interest of the parties and the public in a swift resolution of the dispute." (internal citation omitted)).

[33]     Since we issued our orders, the offending Facebook post has been deleted, Presiding Judge Lamorena sent a letter to Attorney General Moylan instructing him to not use his name and title as a reference in any public forums, and Presiding Judge Lamorena has stated "unequivocally" that Attorney General Moylan is not in a special position to influence him. After "scrutiniz[ing] with care" the asserted grounds for disqualification, we conclude that San Agustin merely "claims an appearance of partiality" based on the appearance of an endorsement, but a reasonable person knowing all the facts would know that Presiding Judge Lamorena has not endorsed Moylan. *See Tennessen*, 2010 Guam 12 ¶ 49. A reasonable person knowing all the facts would not conclude that Presiding Judge Lamorena let his relationship with Moylan influence his judicial conduct or judgment. Nor would a reasonable person conclude that he has lent the prestige of his judicial office to advance the private interests of Moylan or that he has permitted Moylan to convey the impression that he is in a special position to influence him. Because the offending post has been deleted, and the affirmative steps taken by Presiding Judge Lamorena cure any potential

---

from making public statements in the course of their official duties or from explaining for public information the procedures of the court."), *with* ABA Model Code of Judicial Conduct Canon 2, Rule 2.10(E) (2020) ("[A] judge may respond directly or through a third party to allegations in the media or elsewhere concerning the judge's conduct in a matter."). *See also* Ariz. Rev. Stat. Ann. Sup. Ct. Rule 81 CJC Rule 2.10(E) ("[A] judge may respond directly or through a third party in writing, via social media or broadcast media or otherwise to allegations in the media or elsewhere concerning the judge's conduct in a matter or to false, misleading, or unfair allegations or attacks upon the judge's character or reputation.").

appearance of impropriety, we do not feel his disqualification is merited on these grounds.[6]  *Cf.*

*Commonwealth v. Johnson*, 711 N.E.2d 578, 584 (Mass. 1999) ("Any adverse inference that might

have been created by the judge's conduct was cured by his very thorough and explicit

instructions."); *Jackson*, 21 A.3d at 37-38.

**C.  We Exercise Our Supervisory Authority to Clarify the Proper Procedure When a Party Seeks to Challenge a Recusal Judge for Cause**

[34]     Nadeau argues this court may want to address under its supervisory powers "the procedures

regarding the disqualification of judges and[,] in particular[,] (1) the manner in which judges are

appointed to review the denial of disqualification requests, and (2) the rights of the parties to

briefing and hearing once the review is assigned to a reviewing judge . . . ."  Nadeau's Br. at 20.

This clarification is justified.  *See People v. Angoco*, 2006 Guam 18 ¶ 29 (holding that our

supervisory power is intended to "address extreme cases, such as when the Superior Court is acting

in excess of its powers").

[35]     When construing their disqualification statutes, California courts have tried to balance

judicial efficiency with "preserv[ing] public confidence in the impartiality of the courts."  *See*

*Garcia*, 203 Cal. Rptr. at 301 (citation omitted).  Guam's disqualification procedure was modeled

after California's, with some changes provided for a smaller judiciary with a single Superior Court.

In California, the Chairperson of the Judicial Council appoints a recusal judge only if the parties

fail to agree upon a judge to pass on the question of disqualification.  *Id.* at 301-02.  California

courts recognized that an appointed recusal judge remained "subject to the provisions of section

---

[6] On our *sua sponte* review of the record below, since we issued our December 19, 2023 order, Judge John C. Terlaje, sitting as a recusal judge, heard San Agustin and Nadeau's renewed statement of objection calling for Presiding Judge Lamorena's disqualification on different grounds from those raised in this writ proceeding.  *See* Super. Ct. Case No. CF0446-23 (Dec. & Order, Jan. 3, 2024).  Judge Terlaje issued a Decision and Order disqualifying Presiding Judge Lamorena from sitting in the underlying Superior Court case, *id.*, and the case has been reassigned, Super. Ct. Case No. CF0446-23 (Notice of Judge Assignment, Jan. 4, 2024).  We offer no opinion on the merits of Judge Terlaje's decision to disqualify Presiding Judge Lamorena.

170, subdivision (b), as well as canon 3C of the Code of Judicial Conduct," which required the recusal judge to "disqualify himself for any of the reasons which would otherwise justify a challenge for cause." *Id.* at 301.

[36]     If Judge Tolentino had not already recused himself from the case, he would have had to do so once appointed as a recusal judge. It logically follows that a judge who has recused themselves from presiding over a case should not be appointed as a recusal judge. The Superior Court takes the opposite position, but we must reject it as unfounded by law. We exercise our supervisory authority to clarify that a disqualified judge should not be appointed as a recusal judge.

[37]     The Superior Court claims this commonsense conclusion is foreclosed by the plain language of our own rule, Administrative Rule No. 23-002, which provides: "When a judge shall deny his or her qualification under 7 GCA § 6107, the question of the judge's disqualification shall be randomly assigned to *one of the remaining Superior Court judges*." *See* Resp't's Resp. at 22 (Oct. 20, 2023) (quoting Sup. Ct. Admin. R. 23-002, Ex. A at 9 (May 15, 2023)). The Superior Court claims that a plain-language reading of this rule is that "one of the remaining Superior Court judges" means all other judges except the one presiding over the case whose disqualification is sought. *Id.* But our rules and the recusal statutes can be easily harmonized on this point.[7] *See People v. Pinaula*, 2023 Guam 2 ¶ 32 ("[A] court should first attempt to harmonize application of a court-made rule and a statute."). We interpret the phrase "remaining Superior Court judges" to exclude any disqualified judges.

---

[7] Nadeau argues that 7 GCA § 6107 and Administrative Rule No. 23-002 conflict because the statute prescribes appointment of the recusal judge by the presiding judge (or next senior judge when the presiding judge's disqualification is sought) while the Administrative Rule refers to a random assignment. Nadeau's Br. at 21-22. When section 6107 and rules promulgated by this court cannot be harmonized, the rules prevail. *See People v. Pinaula*, 2023 Guam 2 ¶ 35 ("[A]s a general rule, statutes [concerning court administration] are given deference only to the extent to which they are compatible with our rules and conflicts which compromise those rules are resolved with our rules remaining supreme." (quoting *Citizens for a Safer Carroll Cnty. v. Epley*, 991 S.W.2d 562, 564 (Ark. 1999))). In future cases, assignment of recusal judges should be done randomly from a set that excludes any judges that have already been disqualified.

[38] We feel it necessary to exercise our supervisory authority because, aside from restraining the Superior Court from acting in excess of its jurisdiction, the current disqualification procedure protects neither the right to a fair and impartial hearing nor the governmental interest in judicial efficiency. *See Garcia*, 203 Cal. Rptr. at 302 ("[T]he . . . right to immediate review [by writ petition] of the appointed judge's determination of the issue of disqualification of the trial judge amply protects [against] any . . . unfairness of the hearing on the motion to disqualify. At the same time, the governmental interest in efficient and judicious expenditure of court resources is served by the procedure followed in this case.").

[39] We find the reasoning behind the procedure adopted by the California Court of Appeals in *Garcia v. Superior Court*, 203 Cal. Rptr. 290 (Ct. App. 1984), to be persuasive. *Garcia* outlines an approach to cases when parties believe a recusal judge should be disqualified for cause that balances the right to a fair and impartial hearing with judicial efficiency. There, the court outlined a procedure that prohibits challenging a recusal judge for cause and focuses on a writ petition filed in the appellate courts. *Id.* at 302-04. Under that procedure, if a party believes the recusal judge should be disqualified for cause, they must wait until the recusal judge decides the statement of objection; only if the recusal judge denies disqualification can the party then file a writ petition. *Id.* at 302. The appellate court then reviews the fairness of the initial disqualification hearing. *Id.* at 302-03. If the petition shows prima facie grounds for disqualification of the recusal judge and is unchallenged, the appellate court grants the petition. *Id.* at 303. If the recusal judge contests the petition, the appellate court assesses the conflicting affidavits to make a decision. *Id.* In rare, closely contested cases, a referee may be appointed for a thorough hearing. *Id.* This process swiftly resolves disqualification issues. *Id.*

**[40]**    We adopt these principles, developed from *Garcia*, to outline the proper procedure when parties believe a recusal judge should be disqualified for cause:

1. The protections of 7 GCA § 6105 apply to recusal judges, and a judge appointed to pass on the question of another judge's disqualification has a duty to recuse themselves if grounds for disqualification exist.

2. Notwithstanding the applicability of section 6105 to recusal judges, parties may not challenge for cause a recusal judge under section 6107. The proper procedure is to file a writ petition with the Supreme Court following a decision by the recusal judge.

3. This court will determine whether grounds for disqualification of the recusal judge existed. If the court finds the recusal judge to have been disqualified, it will vacate the decision of the recusal judge. In its discretion, the court may then either remand for another judge to pass on the question of disqualification, or it may decide the disqualification issues.

**[41]**    Like the court in *Garcia*, we are also "[]mindful of the possibility for egregious abuse of the process were a challenge for cause permitted against a judge appointed . . . to pass upon a challenge for cause leveled against another judge, ad infinitum." *See Garcia*, 203 Cal. Rptr. at 302. Going forward, assuming the appointed recusal judge has not already been disqualified, following these principles will amply protect against any unfairness while ensuring efficient and judicious expenditure of court resources.

**D. We Exercise Our Supervisory Authority to Clarify that Service of Writ Petitions Should Follow the Current Rules of Appellate Procedure**

**[42]**    The Superior Court admitted at oral argument it has abandoned its argument that service of the writ on the Clerk of the Superior Court was defective. But in our order issued on December 5, 2023, we reserved discussion of the personal-service requirements in these types of proceedings.

It is appropriate to exercise our supervisory authority to clarify the service requirements of writ petitions.

[43]     Rule 24 of the Guam Rules of Appellate Procedure ("GRAP") governs service of petitions for extraordinary writs.  Under the current version of Rule 24, when a party petitions for a writ of mandamus or prohibition directed to a court,[8] they "must file a petition with the Clerk with proof of service on all parties to the proceeding in the trial court.  The party must also provide a copy to the trial court judge."  Guam R. App. P. 24(a)(1).  In *Long-Term Credit Bank of Japan v. Superior Court*, when interpreting a prior version of Rule 24, this court observed:

> [S]ervice of the Petition on the Superior Court is properly accomplished by personally delivering a copy to the Clerk of Court of the Superior Court at his place of work. . . .  We rule that if a petitioner seeks review of a judicial decision made in the lower court, the petition must be served on both the respondent Superior Court of Guam, as well as on all other parties in the lower court proceeding.

2003 Guam 10 ¶ 22.

[44]     Based on language from our decision in *Long-Term Credit Bank*, the Superior Court argued that "the Petition was not 'personally deliver[ed]' to the Clerk of Court.  Instead, the Petition was delivered to the Clerk's Office and received by a subordinate employee of the Clerk of Court.  Thus, Respondent Superior Court was not properly served here, and GRAP 24(c) was violated."  Resp't's Resp. at 4.  Rule 24 has been amended several times since our decision in *Long-Term Credit Bank*, and under the current version, the petition is governed by subsection (a), not subsection (c).[9]

---

[8] As we have discussed before, a writ petition is properly directed to a court, rather than a judge, when it seeks review of a judicial decision.  *Long-Term Credit Bank of Japan v. Superior Court*, 2003 Guam 10 ¶ 18 (per curiam).

[9] The version of Rule 24(a) interpreted in *Long-Term Credit Bank* governed writs "directed to a judge."  2003 Guam 10 ¶ 18.  As then written, subsection (a) was limited to "the rare case where the petitioner seeks a writ directed to the lower court *judge* as distinguished from the lower court."  *Id.* ¶ 19 n.9.  But we have since amended subsection (a) to now apply to the typical writ petition addressed to a court.  *See* Guam R. App. P. 24(a).

**[45]**    We find that the Superior Court's reading of *Long-Term Credit Bank* is unjustified.  In *Long-Term Credit Bank*, we found the petition was properly addressed to the Superior Court, yet it was served on the trial judge's chamber clerk.  *Long-Term Credit Bank*, 2003 Guam 10 ¶¶ 20-22.  Our statement that service of a petition addressed to the Superior Court is "properly accomplished by personally delivering a copy to the Clerk of Court of the Superior Court at his place of work" should not be read to mean that putting the petition into the Clerk's hands is the exclusive means of accomplishing service—but a gentle suggestion that service on the judge's chamber clerk was misguided and viewed with disfavor.  *See id.* ¶ 22.  But even our opinion in *Long-Term Credit Bank* left open whether an effort as misguided as serving a judge's chamber clerk could still be sufficient service upon the Superior Court.  *Id.* ("The finding of a waiver makes it unnecessary to determine whether service on Judge Lamorena's chamber clerk is sufficient to satisfy the requirement that the petition be served on the Superior Court.").

**[46]**    Our statement made in dicta about "personally delivering a copy to the Clerk of Court" was not the creation of a new standard, but a reference to language that ought to have been familiar to counsel before the court.  *See id.*; *see also* Guam R. Civ. P. 5(b)(2) (service is made by "[d]elivering a copy to the person served"); Guam R. App. P. 10(c) ("Personal service includes delivery of the copy to a responsible person at the office of counsel.").  If service of a writ petition is attempted on the correct parties and in a way that follows court rules, it is sufficient.  *See* Guam R. Civ. P. 5(b)(2)(A)(i)-(ii) (stating service is made by delivering a copy to the person served, which can be accomplished by: "handing it to the person; [or] leaving it at the person's office with a clerk or other person in charge, or if no one is in charge leaving it in a conspicuous place in the office").

[47]     The argument that leaving the petition with a "subordinate employee" in the Clerk's Office was not sufficient process on the Clerk of the Superior Court lacks merit because service is properly made when the paper is left "at the person's office with a . . . person in charge." *Id.*

**E. We Exercise Our Supervisory Authority to Clarify that Service of a Statement of Objection Should Comply with Court Rules**

[48]     The Superior Court's misapprehension of the correct standard for service of a writ petition may be caused in part by our discussion of the service requirements for a statement of objection elsewhere in *Long-Term Credit Bank*.  Although we found that any defect in service of the statement of objection had been waived in that case, we observed that "under section 6107, a recusal statement must be served on the judge personally, into the judge's hands." *Long-Term Credit Bank*, 2003 Guam 10 ¶ 40.  Although this interpretation of section 6107 was dicta and not essential to our decision in *Long-Term Credit Bank*, over the past two decades this statement has shaped the common practice in our courts.  Given the amendment of the Organic Act and accumulation of practical experience under this standard in the intervening 20 years, we now exercise our supervisory jurisdiction to amend this standard.

[49]     When we decided *Long-Term Credit Bank* in 2003, this court was not invested with the Organic rulemaking power it now has.  The Organic Act was amended in October 2004, "at which time the Guam Supreme Court was explicitly granted authority to 'make and promulgate rules governing the administration of the judiciary and the practice and procedure in the courts.'" *Pinaula*, 2023 Guam 2 ¶ 54 (citation omitted).  This amendment was "adopted to protect and elevate the judiciary as a co-equal branch of government." *Id.*  In *Long-Term Credit Bank*, we acknowledged that if at that time we were not uniquely subject to the legislative intent over judicial administration, policy would have led us to adopt a more prudent standard:

Finally, we concur with the Bank's contention that, as a policy matter, the service requirement in section 6107 should not be limited to personal service on a judge. By providing that the judge be served, it is evident that the legislature intended that the judge against whom recusal is sought be given notice of the recusal request. While notice is obviously accomplished via personal service, a better rule would be to allow substitute service considering how unworkable it would be to require parties to seek out the judge [to] whom service is directed. *See Clemens v. District Court*, 390 P.2d 83, 87 (Colo. 1964) (en banc) ("As frequently pointed out, there would be indefinite delays in administration of justice, the equivalent of a denial of justice, if some other mode of notice than the personal service of process was not authorized." (citation omitted)). Moreover, interpreting the service requirement under section 6107 as placing the document into the judge's hands is invariably impracticable considering that judges are often unapproachable due to courthouse security procedures. Some judges make themselves unapproachable even outside the courthouse by employing marshals to guard them. Considering the hurdles a party may be required to surpass to accomplish service by delivery into the hands of the judge, a better rule should allow for service in other ways which are reasonably calculated to give the judge notice of the recusal request. One option would be to allow service on a responsible person other than the judge, such as the Clerk of Court or the judge's chamber clerk. Notwithstanding our views on the matter, we are constrained by the legislative intent revealed in the statutory language.

2003 Guam 10 ¶ 41.

[50]     Today, our views on the administration of the judiciary and the practice and procedure in the courts of Guam are no longer constrained by the legislature as they were in 2003. With the amendment of the Organic Act, we have been given the authority to adopt the "better rule." The past two decades have confirmed our fears that requiring a statement of objection to be placed into the judge's hands is impracticable. We now exercise our supervisory authority to state that service of a statement of objection can be properly made on a judge in any manner authorized for service of a paper on a party under the Guam Rules of Civil Procedure or Guam Rules of Appellate Procedure—even if that method can be technically characterized as "substitute" service.

//

//

//

## F.  We Refer Moylan's Conduct to the Office of Regulation Counsel

[51]     Canon 3 of the ABA Model Code of Judicial Conduct states:

> A judge who receives information indicating a substantial likelihood that a lawyer has committed a violation of the Rules of Professional Conduct . . . should take appropriate action.  A judge having knowledge that a lawyer has committed a violation of the Rules of Professional Conduct . . . that raises a substantial question as to the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects shall inform the appropriate authority.

ABA Model Code of Judicial Conduct Canon 3(D)(2) (2003).  The Commentary to the Model Code states that "[a]ppropriate action may include direct communication with the judge or lawyer who has committed the violation, other direct action if available, and reporting the violation to the appropriate authority or other agency or body." *Id.*, cmt.

[52]     Considering the particular circumstances here, we have referred Moylan's conduct to the Office of Regulation Counsel for investigation.  Order at 5-6 (Dec. 19, 2023) (citing *DFS Grp. L.P. v. Paiea Props.*, 131 P.3d 500, 508 (Haw. 2006)).  In doing so, we express no opinion on whether violations of the Guam Rules of Professional Conduct have occurred.  We have referred the record to the Office of Regulation Counsel for its review without an explanation of specific misconduct, other than Moylan may have engaged in conduct that does not meet the Guam Rules of Professional Conduct.  *See id.* at 5 (citing *DFS*, 131 P.3d at 508).  An expository explanation for the referral is unnecessary because it may have the unavoidable effect of the court expressing its views of the conduct before its investigation, and because the Office of Regulation Counsel can conduct a thorough investigation.  *See DFS*, 131 P.3d at 508 nn.13, 14.  Given the circumstances, it is inappropriate for this court to now express any opinion on whether the matter referred to the Office of Regulation Counsel involves unprofessional conduct.

[53]     We refer Moylan's conduct, as described in the record before us, to the Office of Regulation Counsel for further investigation.

## V. CONCLUSION

**[54]** We **GRANT** the petition for writ of prohibition in part, *nunc pro tunc* to December 19, 2023, and **VACATE** the orders of Judge Tolentino deciding the disqualification issue. The petition to disqualify Presiding Judge Lamorena is **DENIED**, *nunc pro tunc* to December 19, 2023.[10] We exercise our supervisory authority to clarify the proper procedures (1) when a party seeks to challenge a recusal judge for cause, (2) for service of a writ petition, and (3) for service of a statement of objection on a judge or justice. Finally, we refer Moylan's conduct discussed above to the Office of Regulation Counsel.

/s/
F. PHILIP CARBULLIDO
Associate Justice

/s/
KATHERINE A. MARAMAN
Associate Justice

/s/
ROBERT J. TORRES
Chief Justice

---

[10] *See supra* note 2.